ORIGINAL

Paul J. Sulla, Jr. (SBN 5398)
Attorney at Law
P.O. Box 5258
2061 Kalanianaole Ave.
Hilo, HI  96720
Telephone: 808/933-3600
Facsimile: 808/933-3601

Attorney for Plaintiff,
BRIDGET DIAS

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

AUG 1 1 2010

at ____ o'clock and ____ min ____ M.
SUE BEITIA, CLERK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BRIDGET DIAS, an individual,<br><br>          Plaintiff,<br><br>     vs.<br><br>QUICKEN LOANS INC., a Michigan corporation; BANK OF AMERICA CORPORATION, a Delaware Banking corporation formerly known as COUNTRYWIDE BANK FSB; and DOES 1-100, inclusive<br><br>          Defendants. | Civil No. **C V 10  0 0 4 6 3  SOM LEK**<br><br>**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF; RESCISSION AND MONETARY DAMAGES; VERIFICATION; SUMMONS** |

**INTRODUCTION**

COMES NOW the Plaintiff, BRIDGET DIAS (hereinafter referred to as "Plaintiff" or "Borrower"), by and through her attorney Paul J. Sulla, Jr., for this Complaint against Defendants QUICKEN LOANS INC., a Michigan Corporation and BANK OF AMERICA CORPORATION, a Delaware Banking Corporation formerly known as COUNTRYWIDE BANK FSB and alleges and avers as follows:

**PARTIES**

1.   At all times relevant herein, Plaintiff, of majority age, was and is a resident of Hilo, County of Hawaii, and State of Hawaii.

2.   The real estate located at 206b East Kinai Place, Hilo, Hawaii 96720 (hereinafter referred to as "Subject Property") is the subject of this litigation and is the residence of the Plaintiff and her three children.

3. On or about July 9, 2010, Plaintiff was awarded sole title to the subject property, subject to the mortgages of record, from her former husband Jerome Dias *pursuant to* Divorce Decree FC-D No. 10-1-0008 issued by the Family Court of the Third Circuit in Hilo.

4.   Plaintiff purportedly entered into a loan repayment and security agreement on or about, December 9, 2005 with Defendant QUICKEN LOANS, INC., a Michigan corporation, having an address of 20555 Victor Parkway, Livonia, Michigan 48152 (hereinafter referred to as "QUICKEN"), which required Plaintiff to repay a loan of $286,400.00 to QUICKEN.

5.   Plaintiff is informed, believes and therefore alleges that Defendant QUICKEN is the original mortgage broker for the loan made to Plaintiff. On or about February 1, 2006, the Plaintiff received notice of the assignment of servicing rights to her loan to COUNTRYWIDE HOME LOANS of Van Nuys, CA 91410 (hereinafter referred to as "COUNTRYWIDE").

6. On or about, October 13, 2006, Plaintiff purportedly entered into a second loan repayment and security agreement covering her residence with COUNTRYWIDE, which required Plaintiff to repay a loan of $61,000.00 to COUNTRYWIDE (hereinafter "2nd loan").

7. In July 2008, Defendant BANK OF AMERICA CORPORATION, a

Delaware Banking Corporation (hereinafter referred to as "BANK OF AMERICA") acquired COUNTRYWIDE as a bankruptcy remote entity and thereafter changed its name to BANK OF AMERICA HOME LOANS. BANK OF AMERICA is the current servicer of the note.

8. Plaintiff is informed, believes and therefore alleges that Defendant BANK OF AMERICA alleges to be the owner of the Note and impliedly alleges that QUICKEN assigned, transferred and/or sold its right in the Note to COUNTRYWIDE and/or BANK OF AMERICA, giving power of sale to foreclose on the mortgage. However, no such assignment appears on the record title.

9. Plaintiff is informed, believes and therefore alleges that MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., a Delaware Corporation, having a business address of P.O. Box 2026 Flint, MI 48501-2026, (hereinafter referred to as "MERS") is named to act as nominee for Lender under the mortgage instrument. MERS is not mentioned in the mortgage note.

10. MERS is simply an "artificial" entity designed to circumvent certain laws and other legal requirements dealing with mortgage loans. By designating certain MERS member employees to be MERS corporate officers, MERS has created a situation whereby the foreclosing agency and MERS "designated officer" have a conflict of interest.

11. The Defendants (each of them named in paragraphs 1 through 6 above, shall collectively be referred to as "DEFENDANTS") named herein and "all persons unknown", claiming any legal or equitable right, title estate, lien or interest in the property described in this Complaint adverse to Plaintiff's title thereto and as DOES I through 100 (hereinafter referred to as "UNKNOWN DEFENDANTS") are unknown to Plaintiff. These unknown Defendants and each of them, claim some right, title, estate, lien or interest in the Subject Property hereinafter described adverse to Plaintiff's title, and their claims and each of them

constitute a cloud on Plaintiff's title to the Subject Property. Plaintiff is informed and believes, and on that basis alleges, that each fictitiously named DOE Defendant is responsible for the events happening hereinafter alleged.  Plaintiff will seek leave of the Court to amend this Complaint to allege the true names and capacities of said fictitiously named DOE Defendants when ascertained.

12.  Plaintiff is informed, believes and therefore alleges that at all times mentioned herein, the UNKNOWN DEFENDANTS were individuals and/or business entities, whose forms are unknown and were agents, principals, employees, employers and/or co-conspirators of each and every other named or unnamed Defendant in this Complaint. Plaintiff is informed, believes and therefore alleges that each of said Defendants is and at all relevant times herein was, acting within the scope and consent of the remaining named and unnamed Defendants.

13. As a result of their mortgage activities, Defendants and each of them, are and were subject to and must comply with the Federal Truth In Lending Act (hereinafter referred to as "TILA") [15 U.S.C. §1601-16666j]; [24 C.F.R § 3500.1-3500.17]; the Real Estate Settlement Procedures Act (hereinafter referred to as "RESPA") [12 U.S.C. § 2601 et.seq.]; Federal Trade Commission § 5]; 24 Code of Federal Regulations § 3500.10; § 10241.3; Unfair and Deceptive Business Practices and Acts [UDAP Statutes]; and the Code of Federal Regulations § 226.23(3), Hawaii Revised Statutes sec. 480-2, among others.

## JURISDICTION

14.  Jurisdiction arises under 15 USC 1601 et seq., 15 USC 1635, 15 USC 1640, Title 12, and Regulation Z, Part 226 et seq., Title 24 CFR, Regulation X, part 3500, plus the diversity of the parties.

## FACTUAL ALLEGATIONS

### a. Mortgage Loan is unfair, deceptive and breaches COUNTRYWIDE and APPROVED'S fiduciary duty to Plaintiff.

15. On or about December 9, 2005 (hereinafter referred to as "Origination Date"), Plaintiff allegedly entered into a consumer credit transaction with QUICKEN by obtaining a $286,400.00 mortgage loan note, secured by Plaintiff's principal residence (Subject Property). This note was allegedly secured by a First Mortgage on the Subject Property in favor of QUICKEN (1st Loan).

16. The 1st Loan consisted of the first fifteen (15) years at an interest only payment of $1,521.50 and thereafter the monthly payment becomes fully amortizing at $2,475.22 and the principal paid off over the next fifteen (15) years.

17. This loan was a refinance, cash-out on a principal residence of the Plaintiff. The original lender who held the First Mortgage on the Subject Property was SAXON MORTGAGE totaling $242,091.31 of the balance refinanced by QUICKEN. At the time that the Plaintiff was contractually obligated to SAXON, her total monthly payment was approximately $1,233.66 per month, which made her budget tight. QUICKEN convinced Plaintiff to refinance with them by adding a 2nd loan of $25,000 from GMAC Mortgage Corporation for only another $150.52 per month.

18. At the time the Plaintiff's husband, Jerome Dias, explained the workings of the loan transaction, he told the Plaintiff that she would be able to refinance the loan before the fifteen (15) year term ended and the payment increased to $2,475.22.

19. The refinance cost the Plaintiff $5,993.27 in prepayment penalties to SAXON. These pre-payment penalties were

never explained to the Plaintiff by the Defendants QUICKEN and COUNTRYWIDE when they flipped the Plaintiff's SAXON loan.

20.   The terms of the finance transaction with QUICKEN and COUNTRYWIDE are not clear or conspicuous, nor consistent, and are illegal. The loan stripped over $40,000.0 of the equity from the home, which when included with the costs, fees, and prepayment penalties of the loan transaction reduced the home's value. As a result, it was likely that the Plaintiff would not be able to refinance out of the high rate, or consolidate the loans into one loan, due to lack of equity.

21.   Plaintiff was given a loan that was not appropriate for her. The loan was more expensive in terms of fees, charges and or interest rates than alternative financing for which Plaintiff could have qualified or already had.  The terms of the loan given to Plaintiff are such that she can never realistically repay the loan. Plaintiff was not approved on the fully amortized rate, but rather approved based upon the interest only rate.

22.   On or about October 13, 2006, the Plaintiff entered into the 2nd loan with COUNTRYWIDE for $61,000, initiated by her husband to help build a 4th bedroom to the subject property. The proceeds were used to pay off the GMAC $25,000 2nd loan and various other debts totaling $40,640 with costs of 2,749.13 including a 3.625% loan discount fee to COUNTRYWIDE. This 2nd Loan is fully amortizing over 15 years with a monthly payment of $544.03.

23.   The loan product sold to Plaintiff in this case was exactly the kind of loan that has contributed to our national problem.  The Defendants COUNTRYWIDE and QUICKEN were aware of this trend, and possessed the foresight to advise Plaintiff but failed to do so, while the Plaintiff relied upon the representations of COUNTRYWIDE and QUICKEN. COUNTRYWIDE and

QUICKEN intentionally concealed the negative implications of the loan they were offering, and as a result, Plaintiff faces the potential of losing her home to the very entity and entities that placed her in this position.

24. For years, mortgage brokers and lenders such as COUNTRYWIDE and QUICKEN have been selling loan products that they knew, or should have known, would never be able to be repaid by borrowers like the Plaintiff and would prevent such borrowers from ever actually owning the home. The Defendants COUNTRYWIDE and QUICKEN owed a fiduciary duty to the Plaintiff yet instead, the Plaintiff was offered an interest-only subprime loan product that amounted to no more than a short term lease until the payments became so unaffordable that she now faces either bankruptcy or foreclosure or both.

25. Further, COUNTRYWIDE and QUICKEN relied on stated income, assets and liabilities. Lenders cannot make a reasonable determination of whether Plaintiff could qualify for the home loan without further verification and scrutiny placed upon the underwriting process. There was no determination of the ability of the borrower to repay the loan, with complete disregard for the Guidance Letters issued by Federal Agencies and even Federal and State Law. The underwriter approved this loan based upon a medium to high risk credit score and a belief that the property would continue to increase in value. The Plaintiff clearly should have been declined for this loan.

26. COUNTRYWIDE and QUICKEN further failed to properly verify whether Plaintiff had enough income, reserves and a credit history that supported the loan program offered. Plaintiff simply stated her income, while COUNTRYWIDE constructed the loan program based upon that statement and a credit check only. The failure of COUNTRYWIDE and QUICKEN to

properly underwrite this loan violated their fiduciary duty and placed Plaintiff into a predatory loan.

27.   These acts of unfairness and deception violate several statutes and in essence create an illegal loan.  Had COUNTRYWIDE and QUICKEN used a more accurate and appropriate factor, such as Tax Forms and a more determinative level of scrutiny, of determining the debt to income ratio, Plaintiff would not have qualified for the loan in the first place.

28.   Consequently, COUNTRYWIDE and QUICKEN breached their fiduciary duty to the Plaintiff. They sold a loan product that they knew or should have known would never be able to be fully paid back by Plaintiff. COUNTRYWIDE and QUICKEN ignored long-standing economic principals of underwriting and instead, knowingly, liberally, greedily and without any regard for Plaintiff' rights or their fiduciary duty to the Plaintiff - sold Plaintiff a deceptive loan product.

29.   Each subsequent Defendant who has participated in, been assigned or been transferred rights, or holds a position or interest under this loan agreement, including COUNTRYWIDE, QUICKEN, BANK OF AMERICA and UNKNOWN DEFENDANTS (hereinafter referred to collectively as "Defendants") failed to perform their due diligence in investigating the legal requirements that this loan should have been processed within.  As a result, Defendants now hold an interest in a loan that was improperly handled from its inception.

30.   The allegations and consequential liability that is held by the Defendants COUNTRYWIDE, QUICKEN, and UNKNOWN DEFENDANTS, and each of them, for their role in the fraudulent and deceptive loan program provided to the Plaintiff, will continue to exist to Defendant BANK OF AMERICA. Likewise BANK OF AMERICA was under a fiduciary duty to inspect and examine the

practices of the originators of the loan. Any original violations, breaches and/or illegality will flow to BANK OF AMERICA as well.

b. **BAC's negligent, unfair and deceptive practices and breaches of contractual duties in the servicing of Plaintiff's loan have caused the Plaintiff great damage and emotional distress.**

31. With the economy slowing down the Plaintiff was struggling to meet her mortgage payments when her husband stopped contributing his half of the mortgage payment at the end of 2008. The Plaintiff had made all the mortgage payments under the loan through January 2009. The Plaintiff went to a law firm promising financial relief and was advised by them to stop paying her mortgages so she could qualify for a loan modification. At the same time she filed for child support. After several months she was able to modify her second loan with BAC in June 2009 but she grew concerned when she saw little progress with her first loan with BAC and then she received notices from defendant BAC threatening foreclosure.

32. The plaintiff thereafter entered into a Forbearance Agreement with defendant BAC beginning September 1, 2009 calling for a deferral period payment of $830.67 for six (6) months ending February 1, 2010. Under the Forbearance Agreement BAC promised to suspend any scheduled foreclosure sale provided Plaintiff continues to meet her payment obligations.

33. On December 9, 2009, despite the Plaintiff's full compliance with her payment obligations under the Forbearance Agreement, the Defendant BAC sent the Plaintiff a Notice of Mortgagee's Intention to Foreclose Under Power of Sale and recorded a copy with the Bureau of Conveyances State of Hawaii Doc No. 2009-185138 clouding her title and setting a foreclosure date of February 1, 2010.

34.   Upon receipt of the Notice from defendant BAC, the Plaintiff frantically tried to begin loan modification directly with BAC but she was prevented by BAC on account of her participation in the Forbearance program. The Plaintiff was forced to wait until the forbearance agreement was complete on or after February 1, 2010. During this period the continual stress and great emotional distress brought about by this threat to lose her home caused the Plaintiff to seek medical treatment.

35.   On February 2010, the Plaintiff was able to obtain a one (1) month postponement of the foreclosure sale and was able to file her loan modification papers with defendant BAC. The Plaintiff completed her application and sent in the full complete package to BAC. The Plaintiff was told by BAC that the process could take from 90-120 days to complete.

36.   Each month thereafter the Plaintiff was forced to seek a postponement of the foreclosure sale from defendant BAC. This pressure and stress mounted even more when she attempted to inquire of defendant BAC as to status of her loan and was continually frustrated and dismayed by the many different people in different departments she spoke with and nobody seemed to know what was going on with her application.

37.   On May 22, 2010 the Plaintiff was finally able to reach someone at BAC who could access her case. Unfortunately she learned; her application had been lost! She was told she would have to apply all over again. She was also told by the BAC agent that there were problems with the BAC loss mitigation department.

38.   The Plaintiff was told by BAC that a new application package would be mailed to her within 7 to 14 days. Meanwhile the monthly foreclosure sales were getting harder and harder to put off and the Plaintiff had to call BAC several times to find out when her package would arrive.

39. On July 19, 2010 almost 2 months later four (4) loan modification packages arrived. On July 22, 2010 the Plaintiff sent in her completed loan modification package. On July 28, 2010 the Plaintiff had to re-submit her papers with a new application on account of the divorce settlement. On July 29, 2010 also she provided other cancelled checks requested.

40. On July 28, 2010 when the Plaintiff called BAC on her application she was told that BAC could not help since it showed that the house had been foreclosed. On July 30, 2010 she was informed not only that her application had been denied but that the foreclosure sale was re-set for Monday August 2, 2010.

41. On August 2, 2010 while the defendant BAC was accepting the Plaintiff's 2nd mortgage payment but turned back her first mortgage payment calling for the plaintiff to present a bank check or money order, it also conducted a foreclosure sale of the plaintiff's home and as a result it allegedly intends to convey the title from the sale to itself, the defendant BAC.

### c. BANK OF AMERICA

### Lack Legal Standing To Foreclose

42.   Where a power to sell real property is given to a mortgagee, or other entity whom has placed an encumbrance on title, in an instrument intended to secure the payment of money, the power of sale is part of the security and vests in any person who by assignment becomes entitled to payment of the money secured by the instrument. The power of sale may be exercised by the assignee if the assignment is duly acknowledged and recorded.

43.   MERS allegedly assigned the loan to BANK OF AMERICA behalf of QUICKEN.   MERS was created to eliminate the need for the executing and recording of assignment of mortgages, with the idea that MERS would be the mortgagee of record.  This would

allow MERS to foreclose on the property, and at the same time, assist QUICKEN in avoiding the recording of the Assignments of the loans sold. This saved QUICKEN money in manpower and the costs of recording these notes. MERS was also designed to "shield" investors from liability as a result of lender misconduct regarding the process of mortgage lending. This objective is an important requirement for the later securitization by investment bankers of the note, in many cases.

44.  Since MERS does not have an interest in the note, nor do they receive the income from the payments, and since it is actually an employee of MERS signing the Assignment in the name of MERS, the Assignment executed by the MERS employee is of no effect and illegal. The actual owner of the note has not executed the Assignment to the new party. An assignment of a mortgage in the absences of the assignment and physical delivery of the note will result in a nullity.

45.  It must also be noted that the lender or other holder of the note registers the loan on MERS. Thereafter, all sales or assignments of the mortgage loan are accomplished electronically under the MERS system. MERS never acquires actual physical possession of the mortgage note, nor do they acquire any beneficial interest in the Note.

46.  The existence of MERS indicated numerous violations of the Unfair and Deceptive Acts and Practices due to the conflicting nature and identity of MERS in this process. Each of these practices was intentionally designed to mislead the borrower and benefit the lenders.

47.  MERS has no right to assign a power of sale to foreclose upon the subject property to a successor; and therefore BANK OF AMERICA has no legal standing to foreclose the subject note and mortgage against the Plaintiff.

**d. Plaintiff's loan was pooled and securitized, therefore BANK OF AMERICA does not hold the note, cannot represent the holders, and cannot enforce the mortgage.**

48. Upon information and belief, the Plaintiff alleges that BANK OF AMERICA does not own the Note, but is only Servicer for the mortgage pool holding the Plaintiff's mortgage under a security offering registered and on file with the Securities and Exchange Commission (the "SEC").

49. Because the Mortgage was securitized, the Mortgage was rendered unenforceable because:

(a)  Securitization of the Mortgage created restrictions upon modification of the Mortgage which had not been approved by the mortgagor.

(b)  Without amending the terms and conditions of the Mortgage, securitization converted the Mortgage Note from an alienable, transferable instrument which was and could be sold into a instrument which cannot be sold, transferred or alienated,.

(c)  Defendant does not own or hold the Note and cannot have the power and authority to represent the actual owners of the Note, as a matter of law.

(d)  The subsequent holder of the Note which organized the securitization modified the Mortgage without the consent of the mortgagor and without consideration.

50.  Securitization of a Mortgage makes the note holder disappear. The securitization leaves no party with standing to enforce the note. No party to the securitization is vested with a legal or equitable interest in the note so that no party to the securitization can enforce the note. The following actions deconstruct the holder of the note:

(a) Segmentation of cash flows into tranches;

(b) the avoidance of double taxation through REMIC;

(c) the disconnection of moral hazard (financial loss) from control and management of the note

(d) the insertion of service providing, fee collecting third party managers between the debtor and the creditor and creditor's successors in interest; and

(e) the subordination of the terms and conditions of the note and mortgage to the provisions of the master pooling and servicing agreement converting the bilateral structure of the note into a multilateral contractual arrangement.

51. Under the terms of the note, prescribed payments are due to the note holder. The note holder is either the original mortgagee or a successor in interest. Defendant BANK OF AMERICA is neither.

52. The securitization separates the Mortgage from the Note. Such a separation makes it impossible for the holder of the Note to foreclose, unless the holder of the Mortgage is the holder and/or agent of the holder of the Note. Defendant does not own or hold the Note and has not claimed or demonstrated Defendant represents the actual owner of the Note.

## FIRST CAUSE OF ACTION

### Injunctive Relief – Lack Of Standing

### (Against Defendant BANK OF AMERICA)

53. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

54. This is an action for temporary and preliminary injunctive relief seeking to restrain BANK OF AMERICA from

conveying title from a non-judicial sale upon the Subject Property to any 3rd party during the pendency of this action.

55. Plaintiff has a clear legal right to seek temporary and preliminary injunctive relief, as Plaintiff resides in the Property. Unless restrained, the Defendant BANK OF AMERICA and/or the presently unnamed Defendants may convey the Property or cause the Property to be sold. Such a sale would be to Plaintiff's great and irreparable injury, for which pecuniary compensation would not afford adequate relief. The result would be to ultimately remove the Plaintiff from her home without satisfying the necessary legal standing requirements.

56. A Mortgage may only be enforced by a person legally entitled to foreclose on the debt or such parties' representative such as a nominee or trustee. Transferring ownership and holding of the Note to a fictitious, non-existent owner and holder through securitization renders the Mortgage unenforceable. A Mortgage cannot be foreclosed on behalf of the putative owner and holder of a Note who does not actually own or hold the Note. Defendant is not the real party in interest and is not shown to be authorized to bring this action.

57. Standing requires that the party prosecuting the action have sufficient stake in the outcome and that the party bringing the claim be recognized in the law as being a real party in interest entitled to bring the claim. As a result, although Defendant names itself in the complaint as the owner of the promissory Note and Mortgage, the copies of Mortgage and Note attached to the complaint conflict with this allegation. BANK OF AMERICA as the servicing or sub-servicing agent of a mortgage pool has no legal or equitable interest in the securitized Mortgages.

58. Plaintiff has no adequate remedy at law to redress the harm complained of, and the sale of the Plaintiff's property,

under the circumstances of record, is contrary to equity and good conscience, in that such sale has been instituted by parties who have no legal standing to institute or maintain the foreclosure ab initio.

59. Plaintiff has no other plain, speedy or adequate remedy, and the injunctive relief prayed for below is necessary and appropriate at this time to prevent irreparable loss to Plaintiff. Plaintiff has suffered and will continue to suffer in the future, unless Defendants wrongful conduct is restrained and enjoined, because real property is inherently unique and it is and will be impossible for Plaintiff to determine the precise amount of damage Plaintiff will suffer.

60. As Defendant BANK OF AMERICA has no legal standing to institute or maintain a foreclosure of the Property, there is no harm to said Defendants with the granting of the requested relief, and any claimed harm is substantially outweighed by the irreparable harm to the Plaintiff if the relief requested herein is not granted.

61. The granting of the relief requested herein is in the public interest, as the consuming public, including Plaintiff, will continue to be harmed by the illegal and unlawful conduct of the Defendant BANK OF AMERICA if the relief requested herein is not granted.

62. Under the circumstances herein there is no harm to Defendant BANK OF AMERICA with the granting of the requested relief, no bond should be required as a prerequisite to the granting of the relief requested herein, as there are no costs or other damages which could be contemplated with the granting of the requested relief for which a bond would otherwise be necessary.

WHEREFORE, Plaintiff prays for relief as set forth below.

### SECOND CAUSE OF ACTION

#### Declaratory Relief

#### (Against Defendant BANK OF AMERICA)

63.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

64.  An actual controversy has arisen and now exists between Plaintiff and Defendant BANK OF AMERICA regarding their respective rights and duties. This is an action for declaratory relief, which is being brought pursuant to applicable law to declare that Defendant BANK OF AMERICA, as a result of the unlawful and defective MERS assignment of Mortgage and Note and also the securitization of the loan, have no legal or equitable rights in the Note or Mortgage for purposes of foreclosure, and that said Defendant BANK OF AMERICA as a result have no legal standing to institute or maintain foreclosure on the Property. A judicial declaration is necessary and appropriate at this time under all the circumstances so that Plaintiff may determine her rights and duties under the Note and Mortgage.

65.  Plaintiff has no adequate or alternative remedy at law with reference to the relief requested herein.

66.  As set forth above, Defendant BANK OF AMERICA do not possess the requisite legal rights to foreclose on the Property.

67.  As set forth above, Defendant BANK OF AMERICA have provided no evidence that it has full legal interest in and title to the Mortgage, and has provided no evidence that it has any interest in the Note.

68.  The declaration by this Court that Defendants BANK OF AMERICA has no legal right and cannot satisfy the legal standing requirements to institute and maintain a foreclosure is proper subject matter for declaratory relief.

69.  As set forth above, Defendants BANK OF AMERICA, as the alleged foreclosing party(s), have failed to demonstrate any

valid assignment of either the Mortgage or the Note, and are thus legally precluded from instituting or maintaining a foreclosure.

70.  As set forth above, Defendant BANK OF AMERICA is only the servicer of the Note and cannot institute nor maintain a foreclosure action either directly or indirectly as agent of Defendant QUICKEN or the securitized mortgage pool.

71.  As a result of the Defendant's actions, Plaintiff has suffered damages according to proof, and seeks declaratory relief that Defendant's purported power of sale is void and has no force or effect against the Subject Property.

72. Further, Defendant's actions have been willful, knowing and malicious.

WHEREFORE, Plaintiff prays for relief as set forth below.

### THIRD CAUSE OF ACTION

#### Contractual Breach of Implied Covenant of Good Faith and Fair Dealing

#### (Against All Defendants)

73.  Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

74.  Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. This implied covenant of good faith and fair dealing requires that no party will do anything that will have the effect of impairing, destroying, or injuring the rights of the other party to receive the benefits of their agreement. The covenant implies that in all contracts each party will do all things reasonably contemplated by the terms of the contract to accomplish its purpose.  This covenant protects the benefits of the contract that the parties reasonably contemplated when they entered into the agreement.

75.   The terms of the Loan imposed upon Defendants a duty of good faith and fair dealing in this matter.

76.   Defendants enjoyed substantial discretionary power affecting the rights of Plaintiff during the events alleged in this Complaint. Defendants were required to exercise such power in good faith.

77.   Defendants willfully breached their implied covenant of good faith and fair dealing with Plaintiff when Defendants:

     a.    Willfully withheld numerous disclosures;

     b.    Willfully withheld notices in regard to excessive fees and finance charges including, Underwriting standards, Yield Spread Premiums, Good Faith Estimates, Disclosures of additional income due to interest rate increases, and failure to disclose when negative credit scores were disseminated;

     c.    Willfully placed Plaintiff in a loan that she did not qualify for, could not afford, and subjected him to further financial detriment, while providing Defendants with financial benefits they would not have otherwise enjoyed;

     d.    Willfully placed Plaintiff in a Forbearance Agreement promising to cease all foreclosure action and in consideration for the Plaintiff's payments obligations and then proceeding to harass her with foreclosure sale notices set to take place during and on the day the Forbearance period ends;

     e.    Willfully induced the Plaintiff to attempt a loan modification and then misplaced, lost and delayed in furnishing the Plaintiff with loan

modification forms while it proceeded all the time with foreclosure notices and sale dates.

78. As a result of Defendants' breach of this covenant, Plaintiff has suffered injury and the threat of loss of her home. Plaintiff has incurred, and will continue to incur, legal fees, including attorney fees and costs, as well as expenses to right this wrong.

79. Defendants' actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FOURTH CAUSE OF ACTION

### Violation of TILA, 15 U.S.C. § 1601, et.seq.

### (Against All Defendants)

80. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

81. The Truth In Lending Act (TILA) applies because the transaction involves the extension of credit to a consumer for personal, family or household purposes that is subject to a finance charge and/or payable by written agreement in more than four installments per 15 U.S.C. §§ 1601-1666j.

82. Defendants violated TILA by failing to provide Plaintiff with accurate material disclosures required under TILA, including but not limited to a Good Faith Estimate, rescission disclosures or accurate TIL disclosures prior to the closing of the loan per 12 C.F.R. §§ 226.4(d)(2), 226.19(a), 226.17-18, 226.19(a)(b), and 226.23(b) and not taking into account the intent of the State Legislature in approving this statute which was to fully inform home buyers of the pros and

cons of adjustable rate mortgages in a language (both written and spoken) that they can understand and comprehend; and advise her to compare similar loan products with other lenders. It also requires the lender to offer other loan products that might be more advantageous for the borrower under the same qualifying matrix. Defendants absorbed extremely high fees, while neglecting underwriting standards and failing to disclose or explain the significance of the loan documents and the loan program. This is a clear violation of the public policy of TILA, which is to more closely "even the playing field" and provide a check and balance to the lending industry.

83. Any and all statute[s] of limitations relating to disclosures and notices required pursuant to 15 U.S.C. § 1601, et. seq. were tolled due to Defendants' failure to effectively provide the required disclosures and notices.

84. An actual controversy now exists between Plaintiff, who contends she has the right to rescind the loan on the Subject Property alleged in this Complaint, and based on information and belief, Defendants deny that right.

85. As a direct and proximate result of Defendants' violations, Plaintiff has incurred and will continue to incur damages in an amount according to proof but not yet ascertained, including without limitation, statutory damages and all amounts paid or to be paid in connection with the transaction.

86. Defendants were unjustly enriched at the expense of Plaintiff, who is therefore entitled to equitable restitution and disgorgement of profits obtained by Defendants.

87. Defendants' actions in this matter have been willful, knowing, malicious, fraudulent and oppressive, entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and to deter others from engaging in the same behavior.

WHEREFORE, Plaintiff prays for relief as set forth below.

### FIFTH CAUSE OF ACTION
### Violation of Real Estate Settlement and Procedures Act (RESPA)
### (Against All Defendants)

88.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

89.   RESPA applies because a lender that regularly extends federally related mortgage loans aggregating more than $1 million per year, and intended for the purchase of a one-to-four-family residential property are subject to RESPA per 12 U.S.C. §§ 2601-2617.

90.   Housing and Urban Development's (HUD's) 1999 Statement of Policy established a two-part test for determining the legality of lender payments to mortgage brokers for table funded transactions and intermediary transactions under RESPA:

> (a)   Whether goods or facilities were actually furnished or services were actually performed for the compensation paid and;

> (b)   Whether the payments are reasonably related to the value of the goods or facilities that were actually furnished or services that were actually performed.

In applying this test, HUD believes that total compensation should be scrutinized to assure that it is reasonably related to the goods, facilities, or services furnished or performed to determine whether it is legal under RESPA.

91.   Defendants failed to disclose all affiliated business arrangements, including an Agency relationship between COUNTRYWIDE and QUICKEN, as required by RESPA and 24 C.F.R. § 3500.15.

92.   Defendants failed to provide an accurate HUD-1 at closing (or 1 day before if requested) as required by RESPA and 24 C.F.R. § 3500.8(b).

93.   Defendants violated RESPA because the payments to the mortgage broker and to the lender were misleading and designed to create a financial windfall to themselves, most notably charging the a Yield Spread Premium. These actions were deceptive, fraudulent and self-serving.

94.   As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount not yet ascertained, to be proven at trial.

95.   Actual damages, statutory (up to $1,000 due to Defendants' prior patterns and practices), and treble damages for excessive portion of fees, plus attorney's fees and costs for violations noted are recoverable and requested by Plaintiff.

WHEREFORE, Plaintiff prays for relief as set forth below.

### SIXTH CAUSE OF ACTION

#### Rescission

#### (Against All Defendants)

96.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

97.   Plaintiff is entitled to rescind the loan for all of the foregoing reasons: 1) TILA Violations; 2) RESPA; 3) Fraudulent Concealment; 4) predatory lending and 5) Public Policy Grounds, each of which provides independent grounds for relief.

98.   The Truth In Lending Act, 15 U.S.C §1601, et. seq., extends Plaintiff' right to rescind a loan if the borrower received false or incomplete disclosures of either the loans terms or Borrower's right to rescind. Here, Defendants have failed to properly disclose the details of the loan.

Specifically, flawed underwriting standards, knowledge that Plaintiff was unqualified for the loan program, the initial disclosures do not initial TIL disclosures, and lack of diligence and collusion on the part of the broker, lender and underwriter to place Plaintiff in a loan he could not afford and would ultimately benefit Defendants.

99. The public interest would be prejudiced by permitting the alleged contract to stand; such action would regard an unscrupulous lender.

100. As a proximate result of Defendants' actions, Plaintiff has been damaged in an amount not yet ascertained, to be proven at trial.

WHEREFORE, Plaintiff prays for rescission of the stated loan in its entirety.

## SEVENTH CAUSE OF ACTION

### Fraud

### (Against All Defendants)

101. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

102. Defendants intentionally, willfully and wantonly engaged in the acts with the purpose of deceiving Plaintiff and inducing her to part with their personal and real property by using a stated income loan.

103. The credit application and or available W-2's provided by Plaintiff were enough, in addition to the application itself, for Defendants to know what type of loan should be offered, and what the Plaintiff could not afford. Any falsification of a credit application by a broker or seller for the purposes of securing a loan is de facto fraud.

104. Defendants engaged in the unlawful suppression of facts or circumstances by one of the parties to a contract from

the other, for self-serving purposes and financial gain, which in justice ought to be made known.

105. This loan was fraudulent because:

    a) knowingly approving Plaintiff based solely on stated income;

    b) underwriting a Plaintiff based on a interest only payment is "knowingly" selling a mortgage loan that will fail;

    c) promising to forebear in foreclosure actions in exchange for payments while knowing full well that the foreclosure actions would continue; and

    d) inducing the Plaintiff to apply for loan modification and then delaying, misplacing and losing her application while continuing to proceed with the foreclosure sale.

106. Plaintiff relied on Defendants, while the Defendants' deception was the actual and proximate cause of Plaintiff's damages.

107. Plaintiff is entitled to exemplary and punitive damages for Defendants' fraudulent conduct in the sum to be determined at trial. Further, fraudulent concealment avoids the contract.

WHEREFORE, Plaintiff prays for relief as set forth below.

## EIGHTH CAUSE OF ACTION

### Unfair and Deceptive Acts and Practices – HRS sec 480-2
### (Against All Defendants)

108. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

109. Plaintiff is a consumer within the meaning of Chapter 480, Hawaii Revised Statutes.

110. Plaintiff is specifically in the class of persons that this law was designed to protect.

111. Defendants failed to undergo a diligent underwriting process for this loan as alleged in this complaint. They also failed to properly adjust and disclose facts and circumstances relating to Plaintiff's mortgage loan and placed Plaintiff in a loan, by way of stated income and misleading facts, which they should never have been approved for because the Plaintiff could not afford it.

112. Defendants did have knowledge of these facts, circumstances and risks, but failed to disclose them to Plaintiff. Defendants also used various rates and charges to disguise the actual payment schedule and loaned amount. The Defendants enjoyed unjust enrichment and have profited and deceptively preyed upon Plaintiff and her naïve nature in the industry.

113. Defendants employed various deceptions such as forbearance agreements and loan modifications that they did not intend to honor or comply with to frustrate, intimidate and deprive the Plaintiff of her other options to save her home.

114. By reason of Defendants' fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, the Defendants have engaged in deceptive acts and practices and unfair methods of competition in the conduct of trade and/or commerce actionable under HRS Sec.480-2 and 480-13 that were designed to deprive Plaintiff of their home, equity, as well as their past and future investment.

115. By reason of the foregoing, Plaintiff has suffered and continues to suffer damages in a sum which is, as yet unascertained.

WHEREFORE, Plaintiff prays for relief as set forth below.

## NINTH CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Defendants)

116. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

117. Defendants owed a fiduciary duty to Plaintiff and breached that duty by failing to advise or notify Plaintiff when Defendants' broker knew, or should have known, that Plaintiff would or had a likelihood of defaulting on the loan. Defendants have a fiduciary duty to the borrower to not place her in that loan (in harm's way).

118. Each of the Defendants has abandoned their Fiduciary Responsibility to Plaintiff. Aiding and Abetting occurred by Defendants offering a stated income loan program to Plaintiff, then falsifying a loan application to get the Plaintiff approved for the loan most beneficial to the Defendants.

119. Regarding this loan, it was in the best interest of the Defendants to promote the particular program for which they approved the Plaintiff. It led to a maximization of profits for the Defendants, with no concern for the borrower. A 30-year fixed rate loan would have netted less return for the lender, though better for the borrower.

120. Defendant failed to provide material disclosures regarding the loan and its interest rate to Plaintiff, while in the capacity of Plaintiff's lender and qualified Plaintiff for a loan program that Plaintiff could not afford, while simultaneously allowing a heightened interest rate to benefit the Defendants. Whether a foreclosure proceeding took place, or a deficiency judgment was obtained, the value that Defendants would seek under the loan far exceeds the worth of the Subject Property, as well as what the Plaintiff's expected. This was intentionally perpetrated by the Defendants.

121.   The   purpose   of   entering   into   the   above-described mortgage loan transactions was for Plaintiff to eventually own the   Subject   Property.   That   purpose   was   knowingly   and intentionally   thwarted,   and   indeed   made   impossible   by Defendants' actions alleged herein.

122. Plaintiff is informed, believes and therefore alleges that   Defendants   breached   their   fiduciary   duty   to   Plaintiff because they knew, or should have known that the Plaintiff would or had a strong likelihood of defaulting on this loan.

123. Defendants   failed   to   fully   comply   with   TILA regulations   and   laws   designated   to   protect   Plaintiff.   The failure to do so placed Plaintiff in a serious disadvantage and the potential loss of her home.   Such actions are violations of a fiduciary responsibility owed to Plaintiff by Defendants.

124. Defendants failed to fully comply with their promises, representations and obligations to the Plaintiff to forbear on foreclosure   actions   while   the   Plaintiff   abided   by   the Forbearance Agreement and was completing her loan modification.

WHEREFORE, Plaintiff prays for relief as set forth below.

## TENTH CAUSE OF ACTION

### Unconscionability - UCC-2-302

### (Against All Defendants)

125. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

126. If the court, as a matter of law, finds the contract or any clause of the contract to have been unconscionable at the time it was made, the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

127. When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

128. Here, based on the deception, unfair bargaining position, lack of adherence to the regulations, civil codes and federal standards that the Defendants were require to follow; coupled with the windfall that the Defendants reaped financially from their predatory practices upon Plaintiff, and their deceptive trade and loan modification practices, the court may find that the loan agreement and trust deed are unconscionable and of no force or effect.

WHEREFORE, Plaintiff prays for restitution and relief as set forth below.

## ELEVENTH CAUSE OF ACTION
### Predatory Lending
### (Against All Defendants)

129. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

130. Plaintiff is informed, believes and therefore alleges that as a result of the practices of Defendants, and each of them, throughout the handling of this loan, that such practices are consistent with the definition of predatory lending, and encompass numerous characteristics of such.

131. The Office of Comptroller of the Currency defines Predatory Lending as any lien secured by real estate which shares well known common characteristics that result in Unfair and Deceptive Business Practices under the Act.

132. Acts undertaken by the Defendants here that are consistent with the Office of the Comptroller's definition include the fact that this loan was marketed in a way which

fails to fully disclose all material terms and includes terms and provisions which are unfair, fraudulent or unconscionable.

133. This loan is marketed in whole or in part on the basis of fraud, exaggeration, misrepresentation or the concealment of a material fact and was underwritten without due diligence by the party originating the loan.

134. This loan does not plainly and prominently disclose the good faith estimate of closing costs, nor any profit margins that the Defendants stood to receive based upon the unfair terms of the loan, in whole or in part, to a mortgage loan officer.

135. This loan lends and refinances whereby equity is removed from the home through repeated refinances, consolidation of short term debt into long term debt, interest only loans whereby payments are not reducing principal, high fees and interest rates. Eventually, borrower cannot refinance due to lack of equity. This results in equity stripping.

136. This loan is based on a loan application that is inappropriate for the borrowers. For instance, the use of a No Income stated on the loan application from an employed individual who has or can obtain pay stubs, W-2 forms and tax returns. This loan is underwritten without due diligence by the party originating the loan. There has been no realistic means test for determining the ability of the borrowers to repay the loan. Further, there is a lack of documentation of income or assets and/or job verification.

137. The loan is non-amortizing for half of its term meaning that during the second of the term the fully amortizing payments (over 15 years) would be almost double of the interest only payment of the first half of the term. This increase would be "payment shock" and clearly unaffordable to the Plaintiff who was qualified for the lower interest only payment. This would

prevent the Plaintiff from being able to pay off the note.

WHEREFORE, Plaintiff prays for relief as set forth below.

## TWELVETH CAUSE OF ACTION

### Improper Restrictions As a Result of Securitization
### (Against All Defendants)

138.   Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

139. The Mortgage is a security agreement between the creditor and debtor to secure repayment of the loan by encumbering collateral for the benefit of the creditor. The security agreement may not be modified or amended by one party without the prior written consent of the other.

140. The Servicing and Pooling Agreement ("Pooling Agreement") which is the organic document creating Mortgage backed securities with BANK OF AMERICA as servicer changes the terms and conditions of the Plaintiff' Mortgage. The changes are made unilaterally by a transferee holder of the Mortgage as a successor in interest to QUICKEN named in the Mortgage.

141. The transferee holder creates the Pooling Agreement, organizes the securitization by issuing securities ("asset-backed certificates") collateralized by the mortgage pool under the Pooling and Servicing Agreement and appoints the parties to manage the securitization and control this mortgage pool. The Pooling Agreement imposes additional rules and restrictions upon the Mortgage and Note. These changes as well as others are made without the consent and usually without the knowledge of the Plaintiff as mortgagors.

142. When the Plaintiff executed the Mortgage, as mortgagor, they were neither obligated to agree to an alternate dispute resolution in the event of a default nor restricted

from entering into an alternate dispute resolution.  When
signing the Mortgage, the Plaintiff as mortgagor neither knew
nor had reason to know that a successor in interest to QUICKEN
would subsequently impair transferability of the Mortgage Note
or impose new rules and restrictions upon modification of the
Mortgage.  Failure to abide by the rules and restrictions
imposes liability upon the parties who organized, manage and
control the securitization.

143. The Pooling Agreement creates restrictions upon
modification of the promissory Note by:

    (a) Imposing the restrictions to modification required
to avoid double taxation and make collection of the
payments by the trust and payment to the investors
a single pass through taxable event, under REMIC,
instead of double taxation where the trust and the
investors are each taxed for interest income
earned.

    (b) Imposing restrictions upon the number of Mortgages
in the pool which may be modified.

    (c) Providing a procedure for foreclosure but no
procedure to modify the loan as an alternate
dispute resolution.

    (d) Creating securities with classes of ownership
("tranches") with adverse and opposing financial
interests resulting in so called "tranche warfare"
so that a modification which favors one tranche may
work a detriment upon another thereby creating
liability for the managing parties.

    (e) Restricting the ability to lower interest payments
on the Note.

    (f) Restricting the ability to increase the number of
payments to be made.

(g) Restricting the ability to defer payments.

(h) Restricting the ability to extend the term of the Mortgage.

(i) Restricting the ability to impose a temporary moratorium on payments.

(j) Restricting the ability to accept "short sales" or reduce the principal amount of the debt.

WHEREFORE, Plaintiff prays for relief as set forth below.

### THIRTEENETH CAUSE OF ACTION
### Wrongful Conversion of Note
### (Against All Defendants)

144. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

145. The securitization is a conversion of the Mortgage rendering it null, void and unenforceable. The Mortgage Note when executed could be sold or otherwise transferred, in whole or in part.  The consent given by the Plaintiff as mortgagor and the legal authority as holder to enable the holder to sell or otherwise transfer the Mortgage does not entail the right to convert the Mortgage into a security. The failure to adhere to this distinction has resulted in the widespread conversion from enforceable Mortgages into unenforceable securitized Mortgages. When the Mortgage was securitized, the Mortgage Note was converted and could no longer be sold or transferred, in whole or in part.

146. The parties who manage the securitization such as Defendant BANK OF AMERICA as servicing agent of a pass through trust have no legal or equitable interest in the securitized Mortgage.

147. The securitization divides those who are at a financial risk of loss from a default upon the Mortgage (the investors or certificate holders) from those who control and have decision-making authority over the Mortgage. When the managers decide to foreclose, it is the certificate holders who bear the loss. However, the certificate holders have nothing to say about if, when and how the managers decide to foreclose.

148. The certificate holders, guarantors and Trust insurers bear the losses. Foreclosure avoids litigation from disgruntled certificate holders who could claim a Mortgage modification improperly resulted in a financial loss. By separating the incidence of loss from the authority to foreclose, the original Note has been altered resulting in a change to the Mortgage without the consent of the mortgagor.

149. The conversion of the Mortgage to Mortgage backed securities renders the Mortgage unenforceable. Securitization improperly attempts to divide the Note from the Mortgage and to make the Note a separately enforceable interest. A Mortgage cannot be enforced as a separate interest in the property to be foreclosed apart from and independent of the Note.

WHEREFORE, Plaintiff prays for relief as set forth below

### FOURTEENETH CAUSE OF ACTION

**The Note And Mortgage Are Unenforceable Because The Mortgagor Never Consented To The Securitization.**

#### (Against All Defendants)

150.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

151. Securitization separates control over the mortgage and the decision to foreclose from the note holder and wrongfully delegates these responsibilities to a group of third party managers.

152. The Plaintiff as mortgagor was neither informed of nor asked to consent to securitization of the mortgage. Such consent is required. Control of the mortgage is conveyed to a group of managers who adopt a new set of rules to the terms and conditions of the mortgage. The group of managers does not control the mortgage on behalf of an extant note holder.

153. The interest of the Plaintiff as mortgagor is adversely and materially affected by these changes.

WHEREFORE, Plaintiff prays for relief as set forth below.

## FIFTEENTH CAUSE OF ACTION

### The Restrictions Imposed upon the Modification of the Mortgage are a Clog upon the Equity of Redemption.

### (Defendants Claiming Any Interest In the Subject Property)

154. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

155. The equity of redemption creates a right in every mortgagor to redeem the property, i.e., to pay off the debt and remove the lien encumbrance from the property.

156. By restricting the ability to modify the mortgage, securitization interferes with Plaintiff's rights to redeem the subject property. For example, if the debtor could only afford to pay off 99% of the amount owed, the creditor is barred from accepting the one percent reduction in the payoff. This is a clog on the equity of redemption.

WHEREFORE, Plaintiff pray for relief as set forth below

### SIXTEENTH CAUSE OF ACTION
#### Quiet Title
#### (Defendants Claiming Any Interest In the Subject Property)

157. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

158. Plaintiff is at all times herein mentioned the owner and/or entitled to possession of the Property and a clear title to same.

159. Plaintiff is informed, believes and thereupon alleges that Defendants, and each of them, claim an interest in the Subject Property adverse to Plaintiff.  However, as a result of the conduct more fully described in the preceding allegations, the claim of Defendants is without any right whatsoever, and said Defendants have no legal or equitable right, claim, or interest in the Property.

160.  Plaintiff therefore seeks a declaration that the title to the Subject Property is vested in Plaintiff alone and that the Defendants herein, and each of them, be declared to have no estate, right, title or interest in the Subject Property and that said Defendants, and each of them, be forever enjoined from asserting any estate, right, title or interest in the Subject Property adverse to Plaintiff.

WHEREFORE, Plaintiff prays for relief as set forth below.

### SEVENTEENTH CAUSE OF ACTION
#### The Unenforceability of the Note and Mortgage Requires the Court to declare a Constructive Trust or Mortgage Trust

#### (Defendants Claiming Any Interest In the Subject Property)

161. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

162. The Plaintiff has argued that the mortgage and mortgage note have been rendered unenforceable. Plaintiff has never claimed the underlying debt does not exist and should not be repaid. Having to rule on this action, a court may incorrectly conclude that by this action the debtor seeks release from the repayment of the debt and create an unearned, invidious windfall for the debtor at the expense from the creditor. This is not the case. Nothing in this action denies the validity of the underlying debt. Instead, this action is about the unauthorized interference between the traditional debtor and creditor relationship by a group of interlopers.

163. These additional parties have securitized the mortgage debt in an improper way which interferes with the rights of the Plaintiff as mortgagor. In so doing, they have trampled the rights of the debtor, extinguished the status of note holder and severed the traditional connection between the party who is owed the money and the part who is obligated to pay. Securitization has precipitated a breach of contract resulting from a unilateral, unauthorized modification of the original contract between debtor and creditor. It has imposed restrictions upon modification of the loan in the event of a default without the consent of the mortgagor. The securitization has clogged the equity of redemption. It has made the note which was once transferable inalienable.

164. The doctrine of constructive trusts is a recognized tool of equity designed in certain situations to right a wrong committed and to prevent unjust enrichment of one person at the expense of another either as a result of fraud, undue influence, abuse of confidence or mistake in the transaction.

165. Even if the note and mortgage are legally unenforceable, the court may declare a constructive trust. The court can declare a constructive trust and assure payment to

the trust and certificate holders. As a constructive trust, the court may impose conditions. For example:

    (a)   Review foreclosure fees and charges.

    (b)   Consider compliance with consumer protection laws and avoidance of consumer fraud. Where damages have been suffered by the debtor, the court may allow a set-off.

    (c)   The Court may order mandatory mediation or arbitration.

    **(d)**   The court may consider a wide range of modifications to the note to allow an alternate dispute resolution.

WHEREFORE, Plaintiff prays for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, for the causes set forth herein, ask for the following for each Cause of Action sustained:

    (a)   Immediately take jurisdiction of this matter;

    (b)   Declare that foreclosure sale of the property to enforce the mortgage is improper, in that the Defendant lacks legal standing to enforce the terms of the Note and Mortgage or maintain a foreclosure action of the subject premises;

    (c)   Declare that the property is in a constructive trust and that the court can: (i) review foreclosure fees; (ii) consider the compliance by the Defendants with consumer protection laws and allow set-off for any allowable damages; and/or (iii) order mandatory mediation, arbitration or alternative dispute resolution;

(d)    Enjoin Defendant BANK OF AMERICA from transferring and all persons acting in concert or participating with them, from selling, attempting to sell, or causing to be sold the Property, either under the power of sale in the mortgage or by judicial foreclosure action or encumbering the subject property until further order of the court;

(g)    Enjoin the Defendant BANK OF AMERICA from proceeding with any further collection activity and/or foreclosure activity regarding the subject property until further order of the court;

(h)    Declare the rescission of the Mortgage Loan on account of unfair and deceptive acts and practices by the Defendants, fraud, unconscionability, breaches of fiduciary duties and/or breaches of implied covenants of good faith and fair dealing by all of the Defendants, and to determine the terms of restitution there from;

(i)    Order Defendant BANK OF AMERICA to provide proof of its authority to foreclose on the subject premises by providing a true and complete original Note properly endorsed to Defendant BANK OF AMERICA.

(j)    Determine that the Plaintiff is the prevailing party in this action.

(k)    Award the Plaintiff her actual damages and costs as well as treble damages and/or punitive damages pursuant to and to the extent allowable by law in an amount to be proven at trial, including attorneys' fees and costs, as found to be appropriate upon the trial herein.

(l)    Award Plaintiff such other and further relief as the Court deems just and equitable.

DATED:   Hilo, Hawaii this ___10___ day of August 2010.

_____
PAUL J. SULLA
Attorney for Plaintiff
BRIDGET DIAS